# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)(SN) |

This document relates to:

*August Bernaerts, et al. v. Islamic Republic of Iran*, No. 1:19-cv-11865 (GBD) (SN)

### PLAINTIFF RACHEL UCHITEL'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL FINAL JUDGMENT FOR DAMAGES AS FUNCTIONAL EQUIVALENT OF SPOUSE

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Ethan Greenberg, Esq.
Bruce E. Strong, Esq.
Alexander Greene, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel:     (212) 278-1000
Fax:    (212) 278-1733
Email:  jgoldman@andersonkill.com
           egreenberg@andersonkill.com
           bstrong@andersonkill.com
           agreene@andersonkill.com

*Attorneys for Plaintiff*

Dated:  New York, New York
          May 31, 2023

## TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ................................................................................................. 1

II.    PRELIMINARY STATEMENT ......................................................................... 3

    a.    Orders…...................................................................................................... 3

    b.    Related Cases ............................................................................................. 3

    c.    Jurisdiction ................................................................................................ 6

        i.    This Court Has Subject Matter Jurisdiction Over Iran .............. 7

        ii.    This Court has Personal Jurisdiction over Iran .......................... 9

        iii.    Service by Mail Was Not Successful.......................................... 9

        iv.    Iran Was Served Via Diplomatic Means .................................. 11

    d.    The Clerk Properly Entered Default Against Iran. ................................. 13

    e.    O'Neill Plaintiffs Herein - Liability....................................................... 14

III.    JUDGMENT AS TO DAMAGES SHOULD BE ENTERED ......................... 14

    a.    Damages – Governing Law ..................................................................... 14

        i.    Background ................................................................................ 14

    b.    Solatium Damages ................................................................................... 16

    c.    Functional Equivalent of Immediate Family Members ........................... 18

        i.    Rachel Uchitel, Spouse Equivalent of James Andrew "Andy" O'Grady . 19

        Andy and Rachel ....................................................................... 20

        September 11 .............................................................................. 25

        Aftermath ................................................................................... 28

    d.    Punitive Damages .................................................................................... 30

    e.    Prejudgment Interest ............................................................................... 31

IV.    CONCLUSION................................................................................................. 33

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashton v. al Qaeda Islamic Army,*
  02-CV-6977 (GBD)(SN) ................................................................ *passim*

*Baker v. Socialist People's Libyan Arab Jamahirya,*
  775 F. Supp. 2d 48 (D.D.C. 2011) ....................................................... 31

*Bauer v. Al Qaeda Islamic Army,*
  02-CV-7236 (GBD)(SN) ................................................................ *passim*

*Belkin v. Islamic Republic of Iran,*
  667 F. Supp. 2d 8 (D.D.C. 2009) ........................................................ 16

*Estate of Bland v. Islamic Republic of Iran,*
  831 F. Supp. 2d 150 (D.D.C. 2011) ..................................................... 16

*Dammarell v. Islamic Republic of Iran,*
  281 F. Supp. 2d 105 (D.D.C. 2003), *vacated on other grounds*, 404 F. Supp.
  2d 261 (D.D.C. 2005) ................................................................... 16

*Est. of Heiser v. Islamic Republic of Iran,*
  466 F. Supp. 2d 229 (D.D.C. 2006) ............................................... 4, 16, 17

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic,*
  582 F.3d 393 (2d Cir. 2009) .............................................................. 9

*Havlish, et al. v. Bin Laden, et al.,*
  No. 03-CV-9848-GBD (S.D.N.Y. Dec. 22, 2011) ..................................... *passim*

*O'Neill. Hoglan, et al. v. Islamic Rep. of Iran, et al.,*
  1:11-cv-07550-GBD (Aug. 31, 2015) ................................................ *passim*

*Reed v. Islamic Republic of Iran,*
  845 F. Supp. 2d 204 (D.D.C. 2012) ..................................................... 13

*Samantar v. Yousuf,*
  560 U.S. 305 (2010) ...................................................................... 6

*In re Sept. 11 Litig.,*
  802 F.3d 314 (2d Cir. 2015) ............................................................. 32

*Shapiro v. Republic of Bolivia,*
  930 F.2d 1013 (2d Cir. 1991) ......................................................... 9, 13

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

*Surette v. Islamic Republic of Iran,*
    231 F. Supp. 2d 260 (D.D.C. 2002) .......................................................................16

*In re Terrorist Attacks on Sept. 11, 2001,*
    741 F.3d 353 (2d Cir. 2013) .....................................................................................7

*United States v. Quintieri,*
    306 F.3d 1217 (2d Cir. 2002) ...................................................................................8

*Valore v. Islamic Republic of Iran,*
    700 F. Supp. 2d 52 (D.D.C. 2010) ......................................................................9, 16

**Statutes**

28 U.S.C. § 1605 ............................................................................................. *passim*

28 U.S.C. § 1608 ............................................................................................. *passim*

49 U.S.C. § 40101 ...................................................................................................32

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852
    (2016) ......................................................................................................................6

**Other Authorities**

Fed. R. Civ. P. 55(a) ...............................................................................................13

## I.      INTRODUCTION

Plaintiff Rachel Uchitel in the above-captioned action, by and through her counsel, Anderson Kill P.C., respectfully submits this Memorandum of Law in support of her Motion for Partial Final Judgment as to Damages against the Defendant Islamic Republic of Iran ("Iran"), pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.

This action arises out of the events of September 11, 2001, during which members of the al Qaeda[1] terrorist network hijacked four commercial airliners and used those planes as weapons in coordinated terrorist attacks on the United States (the "September 11th Attacks").  Plaintiffs in the above-captioned cases are individuals injured and personal representatives and eligible family members of individuals killed in the September 11th Attacks.

James Andrew "Andy" O'Grady was a Managing Director at the investment banking firm of Sandler O'Neill & Partners, who was killed in his office on the 104th floor of the South Tower of the World Trade Center on September 11, 2001.  His fiancée, Rachel Uchitel ("Rachel" or the "Moving Plaintiff"), now seeks a determination that she was the functional equivalent of Andy's wife.

More specifically, for all the reasons set forth below and in the accompanying Declaration of Jerry S. Goldman, Esq., with exhibits appended thereto ("Goldman Declaration"), and the Declarations of Rachel Uchitel, Alison Goodman, Susan Bishop and Ethan Greenberg, Esq., which are being filed contemporaneously with this Memorandum of Law, as well as those set forth in prior motions for liability and damages made on behalf of the *O'Neill* plaintiffs, the Moving Plaintiff in the above-referenced matter Rachel Uchitel (who is identified in Exhibit A

---

[1] Arabic words and names are spelled differently in various sources. Plaintiffs have strived for consistency as much as possible, but original spellings are maintained in quoted sources.

annexed to the Goldman Declaration) by and through her counsel, Anderson Kill P.C.,
respectfully moves this Court for an Order:

    (1)    awarding the Moving Plaintiff a judgment as to damages in the same amount previously awarded by this Court to various similarly situated plaintiffs in *O'Neill, Burnett, Havlish, Ashton, Bauer*, and other cases; AND,

    (2)    determining that Rachel Uchitel is the functional equivalent of a spouse of Andrew O'Grady, who died in the Terrorist Attacks on September 11, 2001; AND,

    (3)    awarding solatium damages to the Moving Plaintiff in the amount of $12,500,000, as set forth in annexed Exhibit A; AND,

    (4)    awarding the Moving Plaintiff prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; AND,

    (5)    granting the Moving Plaintiff permission to seek punitive damages, economic damages, and other appropriate damages at a later date; AND,

    (6)    granting permission for all other Plaintiffs in these actions not appearing in annexed Exhibit A to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed; AND

    (7)    granting the Moving Plaintiff such other and further relief as this Honorable Court deems just and proper.

2

## II.     PRELIMINARY STATEMENT

### a.     Orders

This motion is being submitted in accordance with various procedural orders entered by this Court, and the form of this motion and the relief requested herein are intended to comply with various orders of this Court, including the following:

a. The Court's January 24, 2017 Order, ECF No. 3435,[2] requiring that "[a]ll further motions for final judgment against any defaulting defendant shall be accompanied by a sworn declaration attesting that the attorney has (1) complied with the due diligence safeguards [referenced in Section II.D. of the January 23, 2017 letter from the Plaintiffs' Executive Committee (ECF No. 3433)] and (2) personally verified that no relief has previously been awarded to any plaintiff included in the judgment (or, if relief has been awarded, the nature of that relief)."

b. The Court's October 14, 2016 Order, ECF No. 3363, concerning the amounts of solatium damage awards.

c. The Court's October 14, 2016 Order, ECF No. 3362, related to the cases captioned as *Bauer v. Al Qaeda Islamic Army*, 02-CV-7236 (GBD)(SN) and *Ashton v. al Qaeda Islamic Army*, 02-CV-6977 (GBD)(SN).

d. The Court's October 28, 2019 Order, ECF No. 5234, setting forth updated procedural rules.

e. The Court's October 28, 2019 Order, ECF No. 5338, setting forth the scheduling order.

f. The Court's May 5, 2022 Order, ECF No. 7963, setting forth procedures for filing expert reports submitted in support of default judgments.

### b.     Related Cases

Relying on evidence and arguments[3] submitted by plaintiffs in *In re Terrorist Attacks on September 11, 2001*, 03-md-1570, the consolidated multidistrict litigation arising out of the

---

[2] All ECF numbers are to the MDL docket unless stated otherwise.

[3] In each of the Orders of Judgment regarding plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December

September 11th Attacks, this Court on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of certain of the *Havlish*, *Ashton*, *O'Neill*, *Federal Insurance*, and *Hoglan* groups of plaintiffs against Iran. *See, e.g.*, ECF Nos. 2516, 3014, 3016, 3020-23. Subsequently, other liability findings were made for additional *O'Neill* Plaintiffs. After granting the *Havlish* Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* plaintiffs and their decedents. Upon the submissions of the *Havlish* plaintiffs, on October 3, 2012, this Court found, among other things, that "Plaintiffs may recover for [, inter alia,] solatium . . . in an action under Section 1605A. 28 U.S.C. § 1605A(c)(4). In such an action, . . . family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010). This Court also found that the following solatium awards for family members are appropriate, as an upward departure from the framework in *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

| Relationship of Decedent | Solatium Award |
| --- | --- |
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

ECF No. 2623 at 4.

---

15, 2011, hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

The Court has applied the same solatium values to claims of other solatium plaintiffs in *Burnett* (ECF Nos. 3666, 4023, 4126, 4146, 4175, 5061, 5062, 5087, 5138, and 5356) and other solatium plaintiffs in other cases coordinated in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation. *See, e.g.*, ECF Nos. 3175 at 2, 3300 at 1, 3358 at 9, 3363 at 16, 3399, and 3977 at 7.

In that same decision in *Havlish*, this Court also found that Plaintiffs are entitled to punitive damages under the FSIA in an amount of 3.44 multiplied by their compensatory damages award. ECF No. 2623 at 5. The Court has applied that 3.44 multiplier also to judgments in *Ashton*. *See* ECF No. 3175 at 3 (Report and Recommendation to apply 3.44 punitive multiplier); *see also* ECF No. 3229 at 1 (Order adopting in its entirety Report and Recommendation to apply 3.44 punitive multiplier). The Court applied the 3.44 punitive multiplier to the compensatory awards previously awarded in *Burnett*. ECF No. 3666. However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF Nos. 3358 at 11-16, 3363 at 28. Judge Daniels adopted Magistrate Judge Netburn's Report and Recommendation in its entirety. ECF Nos. 3383 at 2, 3384 at 6.

In the *Havlish* decision, this Court also found that prejudgment interest was warranted for the Plaintiffs' solatium damages. ECF No. 2623 at 5.  The *Havlish* plaintiffs sought application of a 4.96% interest rate, which the magistrate judge recommended (ECF No. 2619 at 13-14) and Judge Daniels adopted (ECF No. 2623 at 5). In *Ashton*, plaintiffs sought, and the magistrate judge recommended, application of a statutory nine percent simple interest rate for prejudgment interest. ECF No. 3175 at 7-8.  Judge Daniels adopted the magistrate judge's report and recommendation and applied the nine percent interest rate in multiple instances in *Ashton* and

*Bauer*. *See* ECF Nos. 3229 at 2, 3300 at 1, 3341 at 1. However, in *Hoglan*, Magistrate Judge

Netburn recommended that the 4.96 percent rate for prejudgment interest should be applied to all

solatium claims, ECF Nos. 3358 at 17-20, 3363 at 28-29. Judge Daniels adopted Magistrate

Judge Netburn's *Hoglan* Report and Recommendation in its entirety and applied an interest rate

of 4.96 percent per annum, compounded annually. ECF Nos. 3383 at 2, 3384 at 6.  The Court

applied that interest rate, 4.96 percent per annum, to the awards to other plaintiffs in *Burnett*.

### c.    Jurisdiction

The FSIA provides the "sole basis for obtaining jurisdiction over a foreign state in federal

court." *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010) (citing *Argentine Republic v. Amerada

Hess Shipping Corp.*, 488 U.S. 428, 439 (1989)).  Under the architecture of the FSIA, foreign

states are presumed to be immune from suit in the courts of the United States unless one of the

FSIA's enumerated exceptions to immunity applies.  *See* 28 U.S.C. §§ 1605-1605A; *Samantar*,

560 U.S. at 305.  As discussed below, this Court previously held that subject matter jurisdiction

exists for claims against Iran for injuries resulting from the September 11th Attacks under two

separate, independent provisions of the FSIA: the state sponsor of terrorism exception (28 U.S.C.

§ 1605A) and the noncommercial tort exception (28 U.S.C. § 1605(a)(5)).[4]  *See* the Court's

Findings of Fact and Conclusions of Law in *Havlish, et al. v. Bin Laden, et al.*, No. 03-CV-9848-

GBD, ECF No. 294 (S.D.N.Y. Dec. 22, 2011), hereinafter referred to as "Court Findings," ECF

No. 294 at 46 ¶ 4.  Those rulings control in relation to the present application, although this

---

[4] On September 28, 2016, Congress enacted the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) ("JASTA"), which provides an additional ground for jurisdiction and liability against Iran. *See Id.* § 3. However, because an application for default judgment as to the Moving Plaintiff's claim under the new statute would potentially raise issues not previously addressed by the Court, the Moving Plaintiff is not seeking judgment in reliance on JASTA, but reserves her right to do so in the future, if necessary.

motion focuses solely on the jurisdictional grant and substantive remedies provided under Section 1605A.

Also as discussed below, the Moving Plaintiff has properly effected service of process on Iran, perfecting personal jurisdiction over Iran under the FSIA as well.

### i.     This Court Has Subject Matter Jurisdiction Over Iran

In *Havlish*, this Court concluded that it had subject matter jurisdiction for claims against Iran for injuries resulting from the September 11th Attacks pursuant to both Sections 1605A and 1605(a)(5) of the FSIA, explaining as follows:

> Subject matter jurisdiction exists if the defendant's conduct falls within one of the specific statutory exceptions to immunity.  *See* 28 U.S.C. §§ 1330(a) and 1604.  *Owens v. Republic of Sudan*, 2011 WL 5966900 (D.D.C. Nov. 28, 2011).  Here, this Court has jurisdiction because service was proper and defendants' conduct falls within both the "state sponsor of terrorism" exception set forth in 28 U.S.C. § 1605A and the "noncommercial tort" exception of § 1605(a)(5).

*See* Court Findings, ECF No. 294 at 46 ¶ 4.

As to liability against Iran through the present motion, the Plaintiff seeks the entry of default judgment in relation to their substantive causes of action arising under Section 1605A, and thus only the exception to immunity provided under that section is implicated by the instant proceedings.[5]  With respect to the issue of jurisdiction, this Court's prior holding that Section 1605A provides a proper basis for subject matter jurisdiction for claims against Iran for injuries resulting from the September 11th Attacks is controlling, and the issue need not, and indeed should not, be re-litigated in the context of the present default judgment proceedings.  *In*

---

[5] As indicated previously, the Plaintiff reserves her right to pursue judgments against Iran on additional common law and statutory theories of liability, and to invoke jurisdiction pursuant to Section 1605(a)(5) and JASTA in that context.

*re Terrorist Attacks on Sept. 11, 2001*, 741 F.3d 353, 358 (2d Cir. 2013) (explaining that the "September 11 cases were centralized in part in order to 'prevent inconsistent pretrial rulings'"); *see also United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (internal quotations omitted) ("when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case").

As in *Havlish*, the Plaintiff's actions assert claims against Iran for wrongful deaths and personal injuries resulting from the September 11th Attacks, based on Iran's extensive sponsorship of al Qaeda during the decade leading up to the attacks, and direct support for critical aspects of the 9/11 operation itself. The evidentiary and factual record supporting the present claims is identical to the record this Court considered in issuing judgment against Iran in *Havlish*. Given the similarity of the present claims to those present in *Havlish*, there can be no dispute that this Court's ruling that Section 1605A provided a proper basis for jurisdiction for the claims against Iran in *Havlish* also controls as to the wrongful death and personal injury claims asserted in the Plaintiff's actions.

For example, this Court has also previously extended the ruling in *Havlish* to apply to other related actions against Iran pending in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, namely *Hoglan*, *Federal Insurance*, *Ashton*, *Burnett*, and *O'Neill*. *Hoglan, et al. v. Islamic Rep. of Iran, et al.*, 1:11-cv-07550-GBD, ECF No. 112 (Aug. 31, 2015); *In re Terrorist Attacks on September 11, 2001*, ECF Nos. 3021 (*Ashton*), 3022 (*O'Neill*), 3020 (*Federal Ins.*) (Aug. 31, 2015), 3443 (*Burnett*) (Jan. 31, 2017).

For all the foregoing reasons, this Court's prior ruling concerning the applicability of Section 1605A to claims against Iran for injuries resulting from the September 11th Attacks applies with full force to the claims asserted against Iran in the Plaintiffs' matters.

docs-100600552.1

### ii.        This Court has Personal Jurisdiction over Iran

"Under the FSIA, . . . personal jurisdiction equals subject matter jurisdiction plus valid service of process." *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir. 1991).[6] Service under the FSIA is governed by 28 U.S.C. Section 1608(a).

The Complaint was filed as follows (and summons duly issued):

| NAME OF CASE | CASE NO. | DATE FILED |
|---|---|---|
| *August Bernaerts, et al. v. Islamic Republic of Iran* | No. 1:19-cv-11865 (GBD) (SN) | 12/27/ 2019 |

Following the filing of the complaint and the issuance of a summons, the Plaintiff herein secured a translation of the complaint, summons, and notice of suit into Farsi, and took steps to serve Iran.

Service was effectuated as set forth below.

### iii.        Service by Mail Was Not Successful

Service on Iran could not be effected under 28 U.S.C. § 1608(a)(1) because the United States and Iran do not have any special arrangement for service of process, nor is service permitted by any applicable international convention under the provisions of subsection (2). *See Valore*, 700 F. Supp. 2d at 70.

Accordingly, the Plaintiff first attempted to serve Iran in accordance with Section 1608(a)(3) of the FSIA. Section 1608(a)(3) provides that:

> if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be

---

[6] The Second Circuit has ruled that foreign states are not persons within the meaning of the Due Process Clause. *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 399-401 (2d Cir. 2009). Thus, the personal jurisdiction analysis as to Iran does not include a due process component.

addressed and dispatched by the clerk of the court to the head of
the ministry of foreign affairs of the foreign state concerned.

The Southern District of New York's Clerk's Office Foreign Mailing Instructions provide

plaintiffs with instructions for service by U.S. Postal Service ("USPS"), FedEx, or DHL.  *See*

United States District Court for the Southern District of New York Clerk's Office Foreign

Mailing Instructions at 2.

On the dates set forth in the tables below, the instant Plaintiff attempted to utilize USPS

for service under § 1608(a)(3).[7] Pursuant to the Southern District of New York's Clerk's Office

Foreign Mailing Instructions, plaintiffs prepared an envelope along with the requisite service

documents for the Clerk of the District Court as prescribed, and delivered a Service Packet[8] to

the Clerk.  The Clerk of Court, in accordance with the Southern District of New York's Clerk's

Office Foreign Mailing Instructions and 28 U.S.C. § 1608 (a)(3), attempted to serve the Service

Packet on Iran via USPS.  As set forth in Jerry S. Goldman's Affidavits in Support of Requests

for Clerk's Default (the "Goldman Default Affidavits"), Iran refused to accept the Service

Packet**.**  Because service by mail could not be effected within 30 days, Plaintiffs proceeded to

effect service by diplomatic channels pursuant to § 1608(a)(4).  *See* Jerry S. Goldman's

Affidavits of Service (the "Goldman Affidavits of Service"); *see also* Goldman Default

Affidavits; *see also* Clerk's Certificates of Mailing, as identified in the following table:

| **CASE NAME:** | *August Bernaerts, et al. v. Islamic Republic of Iran* | |
| --- | --- | --- |
| | CASE NO: | No. 1:19-cv-11865 (GBD) (SN) |
| | DATE OF ATTEMPTED SERVICE BY MAIL: | 01/22/2020 |

---

[7] FedEx and DHL were not delivering packages to Iran at the time service was attempted to be effectuated.

[8] The Service Packet, in addition to pre-paid postage, contained an envelope, two copies of the summons and complaint and notice of suit, together with a translation in the official language of the foreign state (Farsi), and a certification of same.

| CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 8 (docket for individual case) |
| GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 6895 |
| GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 6924 |

### iv.    <u>Iran Was Served Via Diplomatic Means</u>

Under 28 U.S.C. § 1608(a)(4),

> if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

Therefore, pursuant to 28 U.S.C. § 1608(a)(4), after service by mail was rejected, the instant Plaintiff delivered to the Clerk of the Court for the U.S. District Court for the Southern District of New York the following items: cover letter, a cashier's check in the amount of $2,275.00 payable to the U.S. Embassy Bern, copies of the Complaint in English, copies of the Complaint in Farsi, Notice of Suit in English, Notice of Suit in Farsi, Summons in English, Summons in Farsi, Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602, Civil Cover Sheet, Affidavits from translators, and a U.S. Airbill (from FedEx) (collectively, "Service Documents").[9]  The Clerk was requested to transmit these documents to the United States State Department in Washington, D.C.  *Id.*  In accordance with the statute and the protocol of the Department of State, it would, in turn, transmit one copy of the papers through diplomatic channels to the foreign state and send the clerk of the court a certified copy of the diplomatic

---

[9] Also included were United States Airbills from the State Department to the Embassy in Bern and back, and to the Southern District of New York Clerk.

note indicating when the papers were transmitted. Plaintiffs met all of those requirements in this case. *See* Goldman Default Affidavits and Goldman Affidavits of Service.

As set forth in the below table, the Clerk of the Court mailed the Service Documents to the Secretary of State, Director of Consular Services, Office of Policy Review and Inter-Agency Liaison, United States Department of State for service on Iran under 28 U.S.C. § 1608 (a)(4). *See* Goldman Default Affidavits and Goldman Affidavits of Service.

As evidenced by letter from Jared Hess, Attorney Advisor, Overseas Citizens Services, Office of Legal Affairs, United States Department of State, to Ruby J. Krajick, Clerk of Court, service was effectuated on Iran as set forth in the below tables, when the U.S. Department of State, assisted by the Foreign Interests Section of the Embassy of Switzerland in Tehran, delivered the Service Documents to the Iranian Ministry of Foreign Affairs under cover of diplomatic notes, whose number is in the below tables. Pursuant to 28 U.S.C. § 1608(c)(1), in instances of service under § 1608(a)(4), service shall be deemed to have been made "as of the date of transmittal indicated in the certified copy of the diplomatic note." *See* Goldman Default Affidavits, Goldman Affidavits of Service, Clerk's Certificates, and Diplomatic Notes.

| **CASE NAME:** | *August Bernaerts, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:19-cv-11865 (GBD) (SN) |
| | DATE OF DELIVERY OF THE DIPLOMATIC NOTE AND SERVICE DOCUMENTS: | 06/29/2020 |
| | DIPLOMATIC NOTE NO: | 1084-IE |
| | CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 12 (docket for individual case) |
| | GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 6895 |
| | GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 6924 |

Based on the foregoing, Plaintiff filed an Affidavit of Service confirming service was effected on Iran on the dates of the diplomatic notes as set forth above.

Because service upon Iran was proper, and Section 1605A of the FSIA provides subject matter jurisdiction for the Plaintiffs' claims against Iran, this Court has personal jurisdiction over Iran. *Shapiro*, 930 F.2d at 1020; *see also Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 209 (D.D.C. 2012). *See* Goldman Declaration ¶ 17.

### d.    The Clerk Properly Entered Default Against Iran.

Iran did not file any responsive pleading or otherwise defend the suit. Rule 55(a) of the Federal Rules of Civil Procedure, provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." *Id*.

The within Plaintiff requested, on the date set forth in the tables below, that the Clerk enter default against Iran because:

- Iran was obligated to "serve an answer or other responsive pleading to the complaint within sixty days after service [was effectuated]." 28 U.S.C. § 1608(d);

- Iran was served on the dates set forth in the table; and

- More than sixty (60) days elapsed since service, and Iran failed to file an answer or other responsive pleading, or take any other steps to defend this action.

Upon the Plaintiff's application, the Clerk issued a Certificate of Default as set forth below.

As Iran failed to timely answer or move in response to the duly served summons and complaint, the Clerk of the Court properly issued a Certificate of Default.

| **CASE NAME:** | *August Bernaerts, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:19-cv-11865 (GBD) (SN) |
| | DATE OF SERVICE: | 06/29/2020 |
| | DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 07/09/2021 |
| | ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 6924 |

**CASE NAME:** *August Bernaerts, et al. v. Islamic Republic of Iran*

| | |
|---|---|
| DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 07/09/2021 |
| ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 6933 |

**e.** ***O'Neill* Plaintiffs Herein - Liability**

The Moving Plaintiff herein filed suit and duly served Iran.  The Clerk's Office, upon the Plaintiffs' applications, issued Clerk's Certificates of Default.

As set forth below, the Plaintiffs in *August Bernaerts, et al. v. Islamic Republic of Iran* filed a motion for default judgments against Iran for liability.  Such motion was granted, with leave to seek a determination of damages at a later date, as specifically described in the table below.

| NAME OF CASE: | *August Bernaerts, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:19-cv-11865 (GBD) (SN) |
| | DATE MOTION FOR LIABILITY FILED: | 11/12/2021 |
| | ECF NO. OF MOTION FOR LIABILITY: | ECF No. 7329 |
| | DATE ORDER DETERMINING LIABILITY: | 01/04/2022 |
| | ECF NO. OF ORDER DETERMINING LIABILITY: | ECF No. 7522 |

## III.   JUDGMENT AS TO DAMAGES SHOULD BE ENTERED

An Order of Partial Final Judgment should be entered for damages for the Moving Plaintiff.

### a.   Damages – Governing Law

#### i.   <u>Background</u>

Section 1605A of the FSIA permits a foreign state to be held accountable for acts of terrorism or the provision of material support or resources for acts of terrorism where the acts or provision of support or resources were engaged in by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency.  28

14

U.S.C. § 1605A(a)(1).  The statute specifies that damages are available "for personal injury or death," § 1605A(a)(1) and (c)(4), and include "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c)(4).  Courts addressing the damages available under the statute have held that, among other damages recoverable, "family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages."  ECF No. 2623 at 2-3 (quoting *Valore*, 700 F. Supp. 2d at 83). Plaintiff identified in Exhibits A are comprised of immediate family members of those killed on 9/11, as demonstrated by documentary evidence of their familial relationship to a 9/11 decedent, such as birth or marriage certificates, sworn affidavits, official documents or other documents signed under penalty of perjury, which attest to a familial relationship eligible for recovery, and, in the case of a subsequently deceased family member, a death certificate or sworn affidavit which reflects that the claimant did not predecease the 9/11 victim.[10]  *See* Goldman Declaration at ¶¶ 4-16, 18-19.

As liability has been established in this matter, as provided for above, the Moving Plaintiff is now entitled to damages in the amounts set forth in Exhibit A, which reflect the damage amounts previously established and applied by this Court in this and other related cases arising from the September 11th Attacks or based upon expert economic reports submitted herewith.  In accordance with the terms of the FSIA, the Moving Plaintiff is entitled to compensation under Section 1605A for their solatium, pain and suffering and economic damages, as applicable, and are also entitled to prejudgment interest.

---

[10] Such evidence is consistent with that contemplated in the Court's July 10, 2018 Order, ECF No. 4045.

### b. Solatium Damages

As set forth above, the FSIA specifically provides for an award of solatium damages. Under § 1605A, family members of a decedent may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of a decedent's society and comfort." *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196 (D.D.C. 2003), vacated on other grounds, 404 F. Supp. 2d 261 (D.D.C. 2005). Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). In cases brought under this exception to the FSIA, solatium claims have been treated as analogous to claims for the intentional infliction of emotional distress. *See, e.g.*, *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "indistinguishable from the claim of intentional infliction of emotional distress" (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001))).

When previously awarding solatium damages in other cases related to the September 11th Attacks, such as those noted above, this Court looked at the framework established by District Court Judge Royce C. Lamberth in *Heiser*, 466 F. Supp. 2d at 229, where the court awarded solatium damages to each spouse of a deceased victim in the amount of $8 million, to each parent in the amount of $5 million, and to each sibling in the amount of $2.5 million. *Id.* This formula, however, may be adjusted upward or downward when circumstances warrant. *See, e.g.*, *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Analyzing the solatium claims of the families of the *Havlish* victims who perished in the September 11th Attacks, Magistrate Judge Maas concluded that an upward departure from Judge Lamberth's framework in *Heiser* was appropriate because the decedents' immediate family members suffered, and continue to suffer "profound agony and grief" and "[w]orse yet, . . . are faced with frequent reminders of the events of that day."  ECF No. 2618 at 10-12.  Judge Maas noted in his July 30, 2012 Report and Recommendation the "extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families . . ."  *Id.* at 11.  In that Report and Recommendation, with which this Court later agreed, Magistrate Judge Maas recommended that solatium damages be awarded to the immediate family members of the victims of the September 11th Attacks in the following amounts:

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

*Id.* at 11.

These exact amounts were adopted by this Court in its October 3, 2012 Order, ECF No. 2623, and were replicated in this Court's June 16, 2016 Order relating to the claims of certain of the *Ashton* Plaintiffs, ECF No. 3300, in the September 12, 2016 Order pertaining to plaintiffs in the *Bauer* case, ECF No. 3341, in the October 14, 2016 Report and Recommendation, ECF No. 3363, and in the October 31, 2016 Order in the *Hoglan* case, ECF No. 3384.  These amounts were, again, adopted by this Court in its April 24, 2018 Order relating to the claims of additional *Ashton* Plaintiffs, ECF No. 3977 at 6–7.  The same amounts were recently adopted in the Court's

June 8, 2018 (Corrected) Order of Partial Final Default Judgment in the matter known as "*Burnett/Iran II*,"[11] No. 15-cv-09903, ECF No. 101.

The solatium loss suffered by the Exhibit A Plaintiff before the Court in this application is legally and factually comparable to those suffered by the plaintiffs in the *Havlish*, *Ashton*, *Bauer*, *Hoglan, O'Neill* and *Burnett* cases. As such, Plaintiff identified in Exhibit A respectfully requests that the Court grant awards of solatium to the immediate family members as identified in Exhibit A in the same amounts indicated herein, consistent with this Court's application of those values established and applied in *Havlish*, and subsequently adopted and applied to plaintiffs in the *Ashton*, *Bauer*, *Hoglan, O'Neill*, and *Burnett* cases.

### c.    Functional Equivalent of Immediate Family Members

The *Hoglan II* October 14, 2016 Report and Recommendation, ECF No. 3363, *adopted by* Mem. Decision and Order dated October 31, 2017, ECF No. 3384, recommended that in addition to those individuals who are considered traditional "family members," damages could also be awarded to non-immediate family members who met certain criteria establishing that she or he had a relationship with the 9/11 decedent that was the "functional equivalent" to that of an immediate family member. *See, Hoglan IV* Report and Recommendation, dated August 8, 2017, ECF No. 3676, Adapted by Mem. Decision and Order dated November 17, 2017, ECF No. 3795. These categories of non-immediate family members included fiancées and domestic partners, step-relatives (including step-children), aunts, uncles, nieces, nephews and cousins. *See* ECF No. 3363.

---

[11] The same values were applied to the claims of other plaintiffs in the earlier *Burnett* case in this Court's order of July 31, 2017. ECF No. 3666.

18

In the October, 2016 Report and Recommendation, ECF No. 3363, three (3) factors were identified by the Court as relevant to the determination of whether a close non-immediate family member was the "functional equivalent" of an immediate family member.  Those factors are: 1) long-term residence or co-habitation in the decedent's household; 2) whether the non-immediate family member ever played a guardian or custodian-like role in the 9/11 decedent's life or vice versa; and 3) whether the biological family member whose role the "functional equivalent" individual played was absent from the family life (i.e. did the non-immediate family member step in to play a "functionally equivalent" role because of the death or long-term absence of the biological family member). *Id*. at 10-12.  In weighing these different factors, the Court stated it would consider whether the non-immediate family member supported the decedent financially and emotionally, or vice versa, and whether the decedent and claimant shared in typical family activities like doing homework, eating dinner and vacationing together. *Id*.  With respect to same-sex domestic partners, the Court noted that "[i]n determining which partners qualify as being functionally equivalent to a spouse, the Court has considered the duration of the relationship, the degree of mutual financial dependence and investments in a common life together, the duration of cohabitation and the presence or absence of a formal engagement as important factors." *Id*. at 14-15.  In previous cases, the Court relied on the statements from the claimant about the nature and quality of the relationship with decedents. *Id*. at 17-28.

i.     **Rachel Uchitel, Spouse Equivalent of James Andrew "Andy" O'Grady**

This motion relates to the Moving Plaintiff Rachel Uchitel, who lost her fiancée and life-partner James Andrew "Andy" O'Grady, an investment banker who worked on the 104th Floor of the World Trade Center, on September 11, 2001 – the very day on which Rachel was to be fitted for her wedding dress.  As set forth below, on September 11, 2001, Rachel and Andy were

19

already husband and wife in all but name; but, because of the terrorist attacks of 9/11, Rachel in essence became a widow before she could become a bride.

### - Andy and Rachel -

Andy O'Grady grew up in Harrington Park, New Jersey.  He went to college at U.C.L.A and was a member of U.C.L.A.'s golf and swim teams.  He became co-captain of U.C.L.A's swim team and qualified for the NCAA championships in the men's 100 and 200 meter breaststroke. (A picture of Andy in his swim cap is annexed as Exhibit A to the accompanying Declaration of Ethan Greenberg, or "Greenberg Dec.")  Andy stayed on for a year as a graduate assistant at U.C.L.A and then returned to the New York area. He went into finance and rose quickly, soon becoming a Managing Director at Sandler O'Neill & Partners, an investment banking firm with offices on the 104th Floor of the South Tower of the World Trade Center.  (*See* Greenberg Dec. Ex. G, and Declaration of Rachel Uchitel, or "Uchitel Dec.," ¶ 10.)

Rachel Uchitel was born in Alaska in 1975.  She moved to New York City as a young girl with her mother when her parents split up.  Rachel's father Robert Uchitel remained in Alaska.  He was a businessman who helped bring cable television to Alaska.  He died of a drug overdose when Rachel was about fifteen.  (*See* Uchitel Dec. at ¶ 2; and Declaration of Susan Bishop, or "Bishop Dec.," at ¶ 1.)

Rachel's mother, Susan Bishop, was a principal in an executive search firm, and she later taught at the Lubin School of Business at Pace University.  Today, Ms. Bishop is retired, but she still works as a movie and television actor from time to time.  (Bishop Dec. ¶ 2; Uchitel Dec. ¶ 2.)

Rachel studied communications and psychology at the University of New Hampshire, graduating in 1996.  She moved back to New York City and worked in publicity and event

docs-100600552.1

planning for several internet businesses, including an educational website called Homework

Central.  (Uchitel Dec. ¶¶ 2-3; Dec. of Alison Goodman, or "Goodman Dec.," at ¶ 3.)

Rachel met Alison Goodman in 1996 and they quickly become close friends.  In the fall

of 1998, Alison and her boyfriend Kevin – who also worked at Sandler O'Neill – introduced

Rachel to Andy O'Grady, a friend of Kevin's from work.  (Uchitel Dec. ¶ 3; Goodman Dec. ¶¶

2-4.)

As noted, Andy was an investment banker at Sandler O'Neill.  By all accounts, Andy was

an exceptionally talented and charming person.  Almost everyone who met him felt immediately

at home with him, as if they were old friends.  (Goodman Dec. ¶ 5; Uchitel Dec. ¶¶ 4, 6; Bishop

Dec. ¶¶ 8, 12.)

When they met, Andy was 29 and Rachel was 23 years old.  The age difference felt

significant to Rachel at the time.  Andy was already an accomplished professional with an

established career, while Rachel felt as if she were still just a kid starting out in life.  In part

because of their age difference, and in part because Andy was such a smart, kind, and

accomplished person, Rachel admired and looked up to Andy.  (Uchitel Dec. ¶ 4.)

Andy and Rachel fell in love, quickly and deeply.  They soon began building a life

together.  Andy and Rachel together became almost inseparable friends with Andy's roommate

Gil D'Andria and his then girlfriend (and now wife) Laurie.  Andy also became friends with

many of Rachel's girlfriends.  Some of them looked up to Andy as sort of a big brother figure

who gave them good advice about their dating lives and their careers.  (Uchitel Dec. ¶¶ 5-6;

Goodman Dec. ¶ 6.)

In the summer of 1999 Andy and Rachel found a house to rent for weekends and

vacations at Sands Point on Long Island.  Rachel could not contribute much financially, but they

picked the house out together and it became a big part of their social life.  They spent a lot of time at Sands Point and often hosted friends and family there.  (Uchitel Dec. ¶ 6; Goodman Dec. ¶ 6; Bishop Dec. ¶¶ 7, 10.)

In part because Rachel admired Andy so much, she wanted to become part of his professional world.  She looked for jobs related to Wall Street.  Among other things, she called Bloomberg News every day for five months in a row in order to ask for a job.  Finally, Bloomberg hired her, and she worked her way up to become a producer for Bloomberg News. Rachel loved the work, and Andy often helped her by teaching her about finance and about Wall Street.  (Uchitel Dec. ¶ 8.)

In May of 1999 – about nine months after Rachel and Andy first met – Andy had his 30th birthday.  Rachel made a special video, about forty-five minutes long, as a birthday gift for Andy.  The video featured Andy's friends, family members, and colleagues from throughout his life talking about Andy and sending him birthday wishes.  (Rachel was even able to get the Coach of Andy's college swim team at U.C.L.A. to appear in the video.)  Rachel gave copies of the video to many of Rachel's and Andy's friends, and some of them still treasure it to this day. The experience of sharing that video brought Rachel and Andy even closer together.  (Uchitel Dec. ¶ 10; Bishop Dec. ¶ 8; Goodman Dec. ¶ 7.)

Rachel and Andy were not yet formally engaged, but by the time of Andy's thirtieth birthday they already knew that they would be together for life, and that is how they acted with each other and with everyone they knew.  (Uchitel Dec. ¶¶ 10, 13; Bishop Dec. ¶ 7.)

In the year 2000, they moved in together to an apartment on the East Side, near Rachel's workplace.  Andy was making considerably more money than Rachel was, and he therefore took chief responsibility for paying major bills such as the rent and car payments.  But the apartment

was their joint home, and Rachel contributed whatever she could to paying their shared household expenses.  And, even though she was working full time, Rachel cooked dinner for the two of them most evenings.  She even surprised Andy for his birthday one year with Japanese cooking lessons.  (Uchitel Dec. ¶¶ 11-12; Bishop Dec. ¶¶ 6-7; Goodman Dec. ¶ 6.)

Rachel and Andy spent a lot of time with each other's families.  Andy and Rachel often had dinner with Rachel's mother Susan, and Susan sometimes dined with Andy alone as well. Andy was a frequent presence in Susan's home; and Andy and Rachel also often travelled to Florida to Susan's parents' home to spend vacations and holidays together there.  To this day, Susan still thinks of Andy every time she plays tennis because she and Andy played together in a mother-son tournament on one occasion when Susan, Andy and Rachel were in Florida visiting with Susan's parents.  Rachel became close with Andy's parents, Jim and Sally O'Grady, too; and Rachel's mother would visit Andy's parents with Andy and Rachel on holidays like Mother's Day.  They felt that they were one extended family together.  (Uchitel Dec. ¶ 9; Bishop Dec. ¶¶ 5-6; Goodman Dec. ¶ 8.)

Rachel and Andy settled into a happy life.  (A picture of the happy couple is annexed as Exhibit B to the accompanying Greenberg Dec.)  They spent weekdays at their apartment in New York and many weekends at Sands Point.  They shared holidays and vacations with their families.  Rachel even purchased a dog named Mickey for Andy and herself.  Andy had previously been somewhat reluctant to get a pet.  But when Andy saw how much Rachel enjoyed caring for Mickey, Andy readily accepted the dog into their family.  That was typical of Andy, who was always kind and good to Rachel.  (Uchitel Dec. ¶ 14; Bishop Dec. ¶ 7; Goodman Dec. ¶¶ 6, 8.)

23

Unfortunately, Mickey died, and Rachel became quite sad – talking with Andy and with their friends and questioning why Mickey had to die before his time.  Andy told Rachel that Mickey had died at the time that was intended for him, and Andy expressed his belief that Rachel therefore should not grieve too long or think that Mickey's life had been cut short.  Later, after Andy was killed, at a time of great personal crisis Rachel remembered those words and took real comfort from them.  Sometimes, Rachel thinks that perhaps Mickey died when he did so that Andy could teach Rachel important lessons about death and grieving before Andy's own passing. (Uchitel Dec. ¶¶ 16-19; Bishop Dec. ¶ 7.)

Andy and Rachel knew they were going to get married and have a family.  But Rachel did not know exactly when and where Andy was going to propose.  They planned a vacation (that they and their families referred to as an "early honeymoon") together in Greece in late August and early September 2001.  Andy later confided in Rachel that he did not want her to spend that trip wondering whether one day or another would be the day on which he would pop the question.  And so, not long before Andy and Rachel left for Greece, Andy had a dinner alone with Rachel's mother, Susan, and asked for her consent to marry Rachel.  Susan, of course, agreed, and she also agreed to keep the conversation secret until Andy proposed to Rachel. (Uchitel Dec. ¶ 14; Bishop Dec. ¶¶ 4, 9.)

A short time later Andy took Rachel out on a rowboat in the lake near the Central Park Boathouse and asked Rachel to marry him. (Andy tried to get down on one knee to propose, but because Andy was a big man, he almost tipped the boat over.) Immediately after the boat ride, Andy took Rachel over to Docks restaurant where he had already organized a surprise engagement party.  It was a wonderful happy evening.  Rachel and Andy felt that – while they still had their formal wedding ceremony to look forward to – they were already married for all

intents and purposes.  They had been together for three years – which was more than half of Rachel's adult life at the time.  They shared a home and a vacation home together.  They pooled their finances and took good care of each other, and they enjoyed their common circle of family and friends.  (Uchitel Dec. ¶ 14; Bishop Dec. ¶¶ 4, 7; Goodman Dec. ¶ 11.)

Andy and Rachel quickly started making wedding plans.  They picked a church and a wedding venue in Florida (near Rachel's grandparents) for May of 2002.  Rachel chose a wedding dress, and she made an appointment to go with her grandmother to Vera Wang on September 11 to have the dress fitted. Andy spoke with the benefits people at Sandler O'Neill and began the process of naming Rachel as the beneficiary of his life insurance policy.  The insurance agent made out the appropriate papers which Andy had planned to sign when Rachel and Andy returned from their trip to Greece.  (Uchitel Dec. ¶ 15; Bishop Dec. ¶ 11.)

Andy and Rachel had a wonderful time in Greece, and they returned to New York City on Sunday night, September 9, 2001.  They very next day, Rachel had the pictures from their trip developed at a one-hour photo shop.  (Uchitel Dec. ¶ 20; Bishop Dec. ¶ 9.)

### - September 11 -

Rachel woke up very early (about 4:00 am) on September 11, as she usually did on work days.  Andy woke up after Rachel had finished showering and getting dressed and was almost ready to leave for work.  Andy told Rachel that he wanted to take their new pictures from their trip to Greece with him to work that day to show their friends at the office, and Rachel agreed. Rachel also made sure to hold on to the negatives.  As Rachel was on her way out the door, Andy asked for a kiss.  Rachel still wistfully recalls telling Andy that she'd just put on her lipstick and that she'd kiss him later.  Then Rachel reminded Andy that they were having dinner with her mom that evening, after Rachel had her wedding dress fitted.  That was the very last time that Rachel saw Andy.  (Uchitel Dec. ¶¶ 21-22.)

25

Andy called Rachel at Bloomberg shortly after he got to work, at about 7:45 a.m., just to say hi.  Andy told Rachel that some of his friends at Sandler were kidding him because he had put on a little weight and his hair had turned a funny shade of orange while they were on their Greek vacation (because Andy had tried some "Sun In" on his hair while they were in Greece).  (Uchitel Dec. ¶ 23.)

About an hour later, the first plane struck the World Trade Center.  There were television screens playing all over the floor at Bloomberg News, and so Rachel and her Bloomberg colleagues watched the North Tower burning while they began to cover the story.  At first, they believed that a small private plane had gotten lost and struck the World Trade Center by accident.  (Uchitel Dec. ¶ 24.)

Rachel was not worried about Andy.  Almost every weekend, when they returned home to the City from Sands Point, Andy would point to the World Trade Center and mention that he worked in the Tower that did not have a steeple on top.  Now Rachel could see that the fire at the World Trade Center was in the Tower (the North Tower) that did have a steeple, and so she thought that Andy was fairly safe.  (Uchitel Dec. ¶ 25.)

Rachel began making phone calls and doing research to cover the story.  Rachel called Andy and he described what he was seeing as he looked out from his office window.  He told Rachel that Sandler O'Neill's employees had been instructed to remain in place and not to try to evacuate the building.  Andy and Rachel talked several more times over the next few minutes, and it became apparent that the situation was much worse than they had thought at first.  Rachel remembers Andy describing the huge fire and telling Rachel that he had seen several people jump out of the burning North Tower.  Andy remarked how desperate things must be over there for people to be willing to jump to their certain deaths.  (Uchitel Dec. ¶26.)

26

docs-100600552.1

Rachel relayed what Andy was telling her on the phone to Dylan Ratigan, who was the Bloomberg on-air anchor that morning.  As luck would have it, Andy was talking to Rachel when the second plane struck.  This time it was Andy's own Tower that was hit.  Rachel saw the huge fireball on the television screens on the newsroom floor, and Andy's telephone line went dead.  (Uchitel Dec. ¶27.)

Rachel's mind immediately began to race.  She tried to find a way to believe that Andy was still alive, despite what she (and everyone else on the newsroom floor) had just seen.  It seemed to Rachel that the second plane had struck the Tower somewhere below where Andy's office was located on the 104th Floor, and so she hoped that Andy could make his way up to the roof and somehow be rescued there.  (Uchitel Dec. ¶ 28.)

Rachel kept trying to call Andy, but without success.  It had not yet occurred to anyone that the Towers could simply collapse.  So Rachel tried to stay calm and remain hopeful that Andy would come through unharmed.  (Uchitel Dec. ¶ 29.)

Then the unthinkable happened.  Andy's Tower collapsed.  Rachel saw it on the TV screens on the newsroom floor.  In essence, Rachel saw Andy – the love of her life – killed on live television.  Rachel had been standing up at that moment, and she tried to sit down.  But she somehow missed her desk chair, staggered backwards, and sank to the floor in shock.  All her friends and colleagues at Bloomberg understood what had just happened to Andy, and they stared at her, dumbfounded.  (Uchitel Dec. ¶ 30.)

Again, Rachel's mind went into overdrive, trying to come up with a scenario in which Andy had survived.  She tried to calculate how much time Andy would have needed to walk down and out of the building after the second plane hit.  As a logical matter, it did not seem at all

likely that Andy had made it out in time before the South Tower collapsed.  But Rachel refused to accept that logic.  (Uchitel Dec. ¶ 31.)

### - Aftermath -

The next few days are kind of a blur for Rachel.  She kept hoping against hope that Andy would somehow come home, or call, or be found still alive in the rubble.  Like many people in her situation, Rachel made up and circulated flyers asking whether anyone had seen Andy. (Uchitel Dec. ¶ 32.)

On Thursday the 13th, Rachel heard a report that Andy might be at one of a number of hospitals, including Bellevue Hospital.  So Rachel went there with her mother and they waited on line to find out if Andy might possibly still be alive and in a hospital.  (Uchitel Dec. ¶ 33.)

Of course, he wasn't.  Rachel was devastated all over again.  Even so, when a number of reporters with camera crews asked her questions there at Bellevue, she drew on her own experience in the news business and tried to give them useful, rational answers.  (Uchitel Dec. ¶ 34.)

But once the questions stopped and the video lights turned off, Rachel was overcome by a huge wave of pain and grief.  She cried out to no one in particular: "Someone has to help me.  I waited my whole life to find Andy.  And now he's gone, and I don't know what to do." Someone took a picture of Rachel at that very moment, weeping.  The photo soon appeared in newspapers all around the world, including the cover of the New York Post.  (A copy of the picture is annexed as Exhibit C to the accompanying Declaration of Ethan Greenberg.)  Rachel was on a national television program the following day because of the newspaper story.  (Uchitel Dec. ¶ 36.)

Slowly, Rachel came to accept the fact that Andy was really gone.  A few weeks later a memorial service was held for Andy at the Boathouse in Central Park – near where Andy had

28

proposed to Rachel.  More than 500 people came from all walks of life came, including Rachel's then-boss, Michael Bloomberg, who was running for Mayor at the time.  (Uchitel Dec. ¶ 37; Goodman Dec. ¶ 9.)

Rachel could not afford to continue to live in Andy and Rachel's East Side apartment, so she moved out.  For the same reason, she also moved out of their Sands Point vacation home. She gave up their joint car lease too.  The Red Cross gave Rachel about $100,000, which she used to help pay her bills and to make a down payment on a place of her own.  Rachel could not bear to go back to work for quite a while.  (Uchitel Dec. ¶ 38; Bishop Dec. ¶ 10.)

Rachel also received some money from the September 11 Victims Compensation Fund, but she cannot remember any of the particulars. Shortly after the September 11 attacks, Rachel's mother Susan called Andy's insurance agent to see whether Andy had completed the process of naming Rachel as the beneficiary of his life insurance policy (as Andy had previously told Susan he intended to do).  The agent sadly reported that all the paperwork was done, but that Andy had planned to sign the papers shortly after returning from Greece.  (Uchitel Dec. ¶ 39; Bishop Dec. ¶ 11.)

On September 11, Rachel Uchitel was supposed to spend a happy afternoon with her grandmother having Rachel's wedding dress fitted and a happy evening dining with her mother and Andy.  (Uchitel Dec. ¶¶ 15, 22; Bishop Dec. ¶ 9.)  Instead, Rachel in essence became a widow before she became a bride.

The September 11 attacks destroyed the life that Andy and Rachel had made together. Her grief was, and often still is, overwhelming.  For a long time, Rachel didn't know what to do with herself or with her life.  And, even now, Rachel sometimes still feels rudderless without Andy by her side.  (Uchitel Dec. ¶ 40; Bishop Dec. ¶¶ 10, 14; Goodman Dec. ¶ 10.)

In the years that have followed September 11 and Andy's death, Rachel has made some very poor life choices – many of which have received a lot of bad publicity.  (*See* the newspaper articles annexed as Exs. E and F to the Greenberg Dec.)  Rachel acknowledges that those bad choices are her own fault.  But she also feels certain that, but for the attacks of September 11, she would still be happily married today to Andy O'Grady, the great love of her life.  (Uchitel Dec. ¶ 41; Bishop Dec. ¶ 14.)  (Andy's father Jim O'Grady has noted the great changes that have overcome Rachel following Andy's death; Mr. O'Grady has expressed the view that these changes are perhaps Rachel's reaction to her grief over losing Andy, and that Rachel is no longer the same person that she once was.)  (Greenberg Dec., Ex. E.)

When Rachel Uchitel said goodbye to Andy O'Grady early on the morning of September 11, she did not even dream that she would never see him again.  Andy was her life, and she was Andy's.  She still feels his loss every day.  Today, Rachel is 48 years old, unmarried, and still in therapy for post-traumatic stress disorder relating to Andy's death.  (Uchitel Dec. ¶¶ 42-45.) (A recent picture of Rachel with her daughter, Wyatt, is annexed as Ex. D to the accompanying Greenberg Dec.)

Andy and Rachel were committed partners for life who were already married in all but name.  They shared a deep and abiding love for one another.  They considered each other family.  Accordingly, the Moving Plaintiff Rachel Uchitel respectfully submits that she should be deemed the functional equivalent of Andy's wife and that she should be awarded the full spousal solatium damages of 12.5 million dollars granted to spouses of September 11, 2001 decedents.

### d.   Punitive Damages

Moving Plaintiff is also entitled to punitive damages under the FSIA.  28 U.S.C. § 1605A(c)(4).  In the *Havlish* Report and Recommendation on damages, the Magistrate Judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising

out of' terrorist attacks."  ECF No. 2618 at 13 (quoting *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)).  This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory).  ECF No. 2623 at 2.  The Court has applied that ratio to awards for plaintiffs in other related cases.  *See, e.g.*, ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); ECF No. 3300 at 1 and Exhibit A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  ECF No. 3363 at 28.  Judge Daniels adopted Magistrate Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages.  ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, Plaintiff herein requests permission to address the issue of punitive damages at a later date.  *See, e.g.*, ECF No. 3666 (Judge Daniels' Order in *Burnett*, authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

e.    **Prejudgment Interest**

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism.  *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011).  This Court awarded the *Havlish* plaintiffs prejudgment interest

31

at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001, until the date of judgment.  ECF No. 2618 at 13-14.  This Court, recognizing that prejudgment interest was appropriate in cases such as this case, adopted the Magistrate Judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See* ECF Nos. 3229 at 2; 3300 at 1; 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101); *In re Sept. 11 Litig.*, 802 F.3d 314, 343 (2d Cir. 2015).  In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest.  *Id.*  Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' claims related to the September 11th Attacks.  *Id.*

However, Magistrate Judge Netburn recently recommended in *Hoglan* that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims. ECF No. 3363 at 28-29.  Judge Daniels adopted Magistrate Judge Netburn's *Hoglan* Report in its

entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims. ECF No. 3384 at 6. Thereafter, in *Burnett/Iran II*, the Court again awarded prejudgment interest of 4.96 per annum, compounded annually.

In light of the Court's decisions in *Hoglan* and *Burnett*, applying the 4.96 percent rate to prejudgment interest, the Moving Plaintiff respectfully requests that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001, until the date of the judgment.

## IV.    CONCLUSION

For all of the reasons stated herein, in the accompanying Declarations of Jerry S. Goldman, Rachel Uchitel, Susan Bishop, Alison Goodman and Ethan Greenberg, in the papers previously submitted to this Court in support of damages against Iran in this *MDL*, and as previously decided by this Court, the Moving Plaintiff Rachel Uchitel respectfully requests that this Honorable Court enter an Order:

> (1)    awarding the Moving Plaintiff a judgment as to damages in the same amount previously awarded by this Court to various similarly situated plaintiffs in *O'Neill, Burnett*, *Havlish*, *Ashton*, *Bauer*, and other cases; AND,

> (2)    determining that Rachel Uchitel is the functional equivalent of a spouse of Andrew O'Grady, who died in the Terrorist Attacks on September 11, 2001; AND,

> (3)    awarding solatium damages to the Moving Plaintiff in the amount of $12,500,000, as set forth in annexed Exhibit A; AND,

(4)     awarding the Moving Plaintiff prejudgment interest at the rate of 4.96

percent per annum, compounded annually for the period from September

11, 2001 until the date of the judgment for damages; AND,

(5)     granting the Moving Plaintiff permission to seek punitive damages,

economic damages, and other appropriate damages at a later date; AND,

(6)     granting permission for all other Plaintiffs in these actions not appearing

in annexed Exhibit A to submit applications for damages awards in later

stages, to the extent such awards have not previously been addressed;

AND

(7)     granting the Moving Plaintiff such other and further relief as this

Honorable Court deems just and proper.


Dated:   New York, New York          Respectfully submitted,
         May 31, 2023

                                     /s/ Jerry S. Goldman
                                     ANDERSON KILL P.C.
                                     Jerry S. Goldman, Esq.
                                     Ethan Greenberg, Esq.
                                     Bruce E. Strong, Esq.
                                     Alexander Greene, Esq.
                                     1251 Avenue of the Americas
                                     New York, NY 10020
                                     Tel:  (212) 279-1000
                                     Fax: (212) 278-1733
                                     Email: jgoldman@andersonkill.com
                                             egreenberg@andersonkill.com
                                             bstrong@andersonkill.com
                                             agreene@andersonkill.com

                                     *Attorneys for Plaintiffs*


34

docs-100600552.1